EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

ILONA OF HUNGARY, INC., Defendant.

No. 92 C 6698.

United States District Court,
N.D. Illinois,
Eastern Division.

April 7, 1995.

Julie E. Rosner, Sharon Ann Seeley, John C. Hendrickson, Julianne Bowman, U.S.E.E.O.C., Chicago, IL, for E.E.O.C.

Thomas L. Brejcha, Jr., James L. Fox, John Michael Brosnan, Abramson & Fox, Thomas P. Carney, Jr., Querrey & Harrow, Ltd., Chicago, IL, Paul Szigetvari, Rolling Meadows, IL, for Ilona of Hungary, Inc.

## FINDINGS OF FACT AND CONCLU-SIONS OF LAW AFTER TRIAL
### (Amended May 18, 1995)

LEFKOW, Executive Magistrate Judge:

Plaintiff, United States Equal Employment Opportunity Commission (the "EEOC"), is an agency of the United States charged with the administration, interpretation, and enforcement of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). At all times material to this action, defendant, Ilona of Hungary, Inc. ("defendant" or "Ilona of Hungary"), has been and is a privately held corporation doing business in Chicago, Illinois, as well as in the states of Colorado, California, New York and Texas. The EEOC brought this action, as it is authorized to do, under sections 706(f)(1) and (2) of Title VII, 42 U.S.C. §§ 2000e–5(b)(1) and (3), alleging, *inter alia,* that defendant discriminated against two of its employees by refusing to accommodate their religious practices and for terminating those employees on the basis of their religion, in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1).[1]

The parties consented to disposition of the case by a United States Magistrate Judge, under the provisions of 28 U.S.C. § 636(c). The case was tried to the court. After trial, the parties submitted proposed findings of fact and conclusions of law. Based on the evidence received, including the stipulations of the parties, the exhibits, and the testimony of the witnesses, the court, having observed the demeanor of the witnesses and considered the weight of all of the evidence, enters the following findings of fact:

## FINDINGS OF FACT

1. On October 12, 1990, Lyudmila Tomilina ("Tomilina") filed with the EEOC a timely Charge of Discrimination, alleging that defendant had discriminated against her because of her religion in violation of Title VII.

2. On October 17, 1990, Alina Glukhovsky ("Glukhovsky") filed with the EEOC a timely Charge of Discrimination alleging that defendant had discriminated against her because of her religion in violation of Title VII.

3. Following an investigation, a reasonable cause finding and unsuccessful conciliation efforts with respect to Tomilina's and Glukhovsky's charges, the EEOC filed this action on October 5, 1992.

4. In 1990, Ilona of Hungary was owned by George and Ilona Meszaros (the "Meszaroses"); in 1990, George Meszaros was owner and chairman of defendant; in 1990, Ilona Meszaros was owner and president of defendant. The Meszaroses' two children also own a portion of the stock of defendant.

5. George and Ilona Meszaros are naturalized American citizens who immigrated to the United States from Hungary in the mid–1950's. Both left Hungary to escape oppression by the Communist government.

6. Ilona of Hungary is engaged in the business of providing skin care services to the public through commercial salons; not only does Ilona of Hungary serve the conventional "beauty" market, it also treats clients for skin care problems on referral from physicians. Ilona of Hungary also manufactures, uses, and sells a proprietary line of skin and nail care products.

7. The Chicago salon, located at 45 East Oak Street, at all relevant times, provided three major services: skin care provided by "estheticians"; nail care provided by manicurists; and body care provided by masseuses.

---

1. The EEOC's claims of religious discrimination on behalf of a third individual were resolved before trial.

8. In the beauty and skin care business generally, and for the Chicago salon in particular, Saturday was the busiest day of the week, when the most revenue was generated.

9. Both Tomilina and Glukhovsky came to the United States as Jewish refugees from what was then the Soviet Union. Tomilina came to this country in 1989 and Glukhovsky in 1981.

10. On or about August 4, 1989, Tomilina began to work for defendant as a manicurist at the Chicago salon. The employer-employee relationship was in all significant respects mutually satisfactory throughout.

11. Between approximately September 12 and September 15, 1990, Tomilina requested of Theresa Gold, the manager of defendant's Chicago salon, that Tomilina be permitted to take off from work on Saturday, September 29, 1990 to observe Yom Kippur.[2]

12. Yom Kippur is, according to the witnesses, one of the highest holy days in the Jewish faith. A faithful adherent of the Jewish religion refrains from work on Yom Kippur.

13. In requesting Yom Kippur off from work, Tomilina did not ask and did not expect to be paid for that day.

14. At the time, Ilona of Hungary employed three manicurists, two of whom were Jewish. At the time Tomilina made her request, one of the other manicurists, Sophie Kapmar, had also asked for Yom Kippur off but had agreed to work when Gold indicated she could not have the day off.

15. At the time she requested Yom Kippur off, Tomilina sincerely believed that she should not work on Yom Kippur because of her religion.[3]

16. When Tomilina made her request to observe Yom Kippur, neither Gold nor the Meszaroses questioned the sincerity of Tomilina's religious beliefs, nor did they express any such doubt.

17. Gold vaguely recalled that she had checked the appointment book and noted that Tomilina had four to seven clients booked.[4] Gold told Tomilina that she would check with the Meszaroses.

18. Gold testified that she contacted the Meszaroses, informing them of Tomilina's request and that Tomilina was already partially booked for September 29. The Meszaroses instructed Gold to deny the request.

19. Gold testified that she informed Tomilina that her request was denied. Tomilina

2. The parties dispute the date on which this occurred. Tomilina testified that she made sure that she requested Yom Kippur 1990 off at least two weeks before the holiday because in 1989 she had asked defendant for Yom Kippur off only a few days beforehand and was told her request was too late; Tomilina therefore decided to ask two weeks in advance in order to make sure that she did not work at all on Yom Kippur in the future. Gold testified that she could not remember exactly when Tomilina asked for the day off but that it was within seven days of the Yom Kippur holiday. She recalled that Tomilina was the third employee who requested that same day off.

Given that defendant admitted in its responses to the EEOC's First Request for Admissions that the request occurred on or about September 13, and having observed the witnesses' demeanor and weighed their testimony, the court finds Tomilina's testimony more reliable and that she made her request at least two weeks in advance of September 29, 1990.

3. The parties offered evidence that Tomilina had requested Monday, October 9, 1989 to observe Yom Kippur. Because she had given only a few

days notice, her request was denied, but her manager (Gold's predecessor) allowed a couple of hours to attend morning service, apparently even clocking her in so that she could be paid for the whole day. Tomilina claimed not to know that she had done anything wrong in accepting a full day's pay when she had been absent two hours. This evidence is tangential to the issues. The evidence does indicate that Tomilina had been told that she must give more notice if she wanted to take Yom Kippur off. Because she testified candidly about the incident, the evidence does not lead the court to discredit Tomilina's character or credibility. The evidence further indicates that Gold did not know about this incident and therefore it did not affect her actions concerning the 1990 request. It may be inferred, as well, that the Meszaroses did not know about the incident until this litigation arose.

4. At the time that Tomilina made her request to Gold to take September 29, 1990 off from work, Tomilina believed that she did not have any clients scheduled for that day. The court is unable to resolve the issue of fact but is willing to credit Gold's testimony that Tomilina was partially booked.

testified that she was never told her request had been denied.[5]

20. After defendant learned that Tomilina needed Yom Kippur 1990 off from work, neither Gold nor any other member of defendant's management considered or offered any accommodation to allow Tomilina to take one day off from work to observe the religious holiday, and defendant did nothing to attempt to accommodate Tomilina's request, such as to attempt to reschedule any appointments which may have been booked for Tomilina to another date or another manicurist.

21. After informing Tomilina that she could not have the day off, Gold expected Tomilina to work on September 29 and she continued to book appointments for Tomilina for that day.

22. On Saturday, September 29, 1990, Tomilina observed Yom Kippur and did not report to work.

23. Tomilina took her regular days off from work on Sunday, September 30 and Monday, October 1, 1990. She returned to work on Tuesday, October 2, 1990, the first date after Yom Kippur on which she was scheduled to work.

24. Tomilina worked October 2, 1990 through October 6, 1990, as scheduled, during which time Gold never advised Tomilina that she had violated any company policy by failing to report to work on September 29, 1990.

25. At the close of business on Saturday, October 6, 1990, Gold called Tomilina into her office and informed Tomilina that the Meszaroses had decided to terminate her employment because she had not come to work on September 29, 1990.

26. On October 6, 1990, when Tomilina was discharged by defendant, neither Gold nor any other member of defendant's management ever told Tomilina that she was terminated because the company could not afford to allow her to be off from work on a Saturday.

27. At the time defendant terminated Tomilina, no member of defendant's management doubted the sincerity of Tomilina's religious beliefs.

28. Defendant replaced Tomilina one month after she was fired.

29. In or about November, 1982, Glukhovsky began to work for defendant as an esthetician at defendant's Chicago facility.

30. At some time shortly before Tomilina's request, on or about September 13, 1990, Glukhovsky requested that she be permitted to take off from work on Saturday, September 29, 1990, to observe Yom Kippur.[6]

31. In requesting Yom Kippur off from work, Glukhovsky did not ask and did not expect to be paid for that day.

32. At the time, Ilona of Hungary employed five estheticians of whom only Glukhovsky was Jewish.

33. On or about September 13, 1990, when Glukhovsky made her request to Gold for time off on September 29 to observe Yom Kippur, Gold did not question the sincerity of Glukhovsky's religious beliefs.

34. Both Gold and the Meszaroses conceded that at the time of Glukhovsky's request they had no basis for doubting the

---

5. Tomilina at the time had limited English language ability. She testified that she understood Gold to have indicated in advance that her request would be granted. It is likely that Gold herself expected it to be granted. Gold testified that after consulting with the Meszaroses, however, she told Tomilina that her request had been denied. Although it is likely Gold did tell her (since she told the others who requested the day off) it may well have been that plaintiff did not understand.

6. Although defendant stipulated that Glukhovsky made her request "on or about" September 13, 1990, at trial it offered (over objection) the testimony of Gold that Glukhovsky's request came "on or about" Tuesday, September 18. Gold recalled that Glukhovksy's request had come before Tomilina's, which, as indicated above, is pegged at least two weeks before the 29th. Defendant has no contemporaneous records of the request and relies only on the four-year memory of Gold. Because this event when it occurred was more significant to the employee than to Gold, and because Gold clearly found herself in the middle of a controversy in which her main stake was to please her employer, the court finds the preponderance of the evidence favors a finding that the request was made on or about September 13.

sincerity of Glukhovsky's request for time off from work on Yom Kippur, 1990 and did not question her sincerity.

35. At the time she requested Yom Kippur off in September, 1990, Glukhovsky, in fact, intended to observe the holy day in keeping with the tenets of her Jewish faith.

36. Glukhovsky testified credibly that although she had not practiced her faith in past years,[7] in recent years she has sincerely believed her religion requires that she refrain from work on Yom Kippur. She testified that her faith has become more important to her life as the result of observing that religion had helped her husband grieve his mother's death, her desire that her son grow up in a religious community, and her husband's family, which is very religious, coming to live in Chicago. This progression is corroborated to an extent by evidence that Glukhovsky worked on Yom Kippur through 1987, but did not in 1988, 1989[8] or 1990. Glukhovsky's testimony about the sincerity of her beliefs is credited.

37. When Glukhovsky made her request to Gold to be off from work to observe Yom Kippur on September 29, 1990, Gold told Glukhovsky that she could not approve her request without first consulting with the Meszaroses.

38. Gold testified that after Glukhovsky's request, she checked the appointment book and noted that Glukhovsky was partially booked for Saturday, September 29. Gold believed that if Glukhovsky was already partially booked, she would be fully booked by September 29. Other estheticians were also partially booked. Gold testified that she informed Glukhovsky that, based on the amount of clients booked and the nature of her request, that she probably could not have the day off but would check with headquarters.[9]

39. On or about September 20, 1990, Gold told Glukhovsky that the Meszaroses had decided that she could not take Yom Kippur off.

40. Glukhovsky testified that when Gold informed her that her request for time off from work to observe Yom Kippur on September 29, 1990 had been denied, she asked Gold whether or not she had stressed to the Meszaroses the importance of the Yom Kippur holiday to her; she asked Gold whether she could speak to the Meszaroses directly the next time Gold communicated with the owners so that she could personally stress the importance of the holiday to them; and she told Gold not to book any clients for her because she was not going to report to work on Yom Kippur. Glukhovsky testified that Gold even advised her to call in sick so as to avoid a confrontation on the issue. Gold denied all of these statements.

41. Gold testified that she expected Glukhovsky to come to work on September 29. The absence record for that day, prepared by Gold, reflects, however, that Glukhovsky's absence was "expected in advance." The court finds that it is likely that Glukhovsky did inform Gold that, despite the Meszaroses' denial of her request, she would not come to work on Yom Kippur, but that Gold, being "between a rock and a hard place" followed her employer's direction and continued to book appointments as if Glukhovsky would come to work. The court credits Glukhovsky's testimony concerning her conversations with Gold.

42. After defendant learned that Glukhovsky needed Yom Kippur 1990 off from work, neither Gold nor any other member of defendant's management considered or offered any accommodation to allow Glukhovsky to observe the religious holiday, and defendant did nothing to attempt to accommodate Glukhovsky's request. For example, between the time of Glukhovsky's request

---

7. Glukhovsky testified she was not allowed to practice her faith in Europe. Defendant offered evidence that Glukhovsky had in the past made statements indicating she did not care about religion.

8. Yom Kippur fell on Glukhovsky's regular day off in 1989.

9. Glukhovsky testified that she checked her appointment book and observed she had no appointments at the time she made the request. Although it is impossible to resolve the issue of fact, the court credits Gold's testimony that Glukhovsky was partially booked.

and September 29, 1990, defendant did not attempt to reschedule any appointments which may have been booked for Glukhovsky to another date or another esthetician, and did not attempt to avoid scheduling appointments for Glukhovsky for September 29.

43. On Saturday, September 29, 1990, Glukhovsky observed Yom Kippur and did not report to work.

44. Glukhovsky took her regular days off from work on Sunday, September 30, 1990 and Monday, October 1, 1990.

45. Glukhovsky returned to work on Tuesday, October 2, 1990, the first date after Yom Kippur on which she was scheduled to work.

46. Glukhovsky worked through October 6, 1990, during which time Gold never advised Glukhovsky that she had violated any company policy by failing to report to work on September 29, 1990.

47. The Meszaroses made a decision to terminate Glukhovsky and instructed Gold to fire her.

48. At the close of business on Saturday, October 6, 1990, Gold called Glukhovsky into Gold's office and informed Glukhovsky that the company had decided to terminate her employment because she did not work on September 29, 1990.

49. On October 6, 1990, when Glukhovsky was discharged by defendant, neither Gold nor any other member of defendant's management told Glukhovsky that she was terminated because the company could not afford to allow her to be off on a Saturday.

50. At the time defendant terminated Glukhovsky, no member of defendant's management doubted the sincerity of Glukhovsky's religious beliefs.

51. Defendant did not replace Glukhovsky until June, 1991.[10]

52. On September 29, Gold was required to accommodate Ilona of Hungary's customers who had been scheduled for Tomilina and Glukhovsky. Some of the customers were seen by other manicurists or estheticians; some may have rescheduled and some may have left disappointed, even angry, that Ilona of Hungary had not been able to keep their appointments. There are no records, however, and no one could identify anyone who was actually turned away. At the least, the unplanned-for absence of two of the service employees made the day more difficult for co-workers and for the manager.

53. Ilona of Hungary's assertion that September 29 was an exceptionally busy day is not borne out by the evidence. Notably, it was Yom Kippur, which likely eliminated some of the clientele for that day. Otherwise, there was nothing remarkable about the day, such as an upcoming holiday, that would have made it a particularly busy Saturday.

54. According to financial records of Ilona of Hungary, an exceptionally busy day occurred on August 25 when the revenue from estheticians was $3,065. The revenue from estheticians on September 29 was $1,742. The preceding Saturday, it was $1,640, and the Saturday following, $1,526. The revenue from manicurists on September 29 was $622. The preceding Saturday, it was $705 and the following, $535. These figures suggest that September 29 revenues were essentially normal.[11]

10. Defendant contends that Glukhovsky was not replaced because it was difficult to find an esthetician with the proper training. The Meszaroses testified that they hire only estheticians who have European training and experience because they are better qualified than their American-trained counterparts. They believe the pool of available European-trained estheticians, manicurists, and masseuses is small. This is credited as part of the reason the job was not filled immediately. The evidence further shows, however, that when defendant did hire an esthetician, the salon was down to three, which further suggests that Ilona of Hungary did not have a pressing need to replace Glukhovsky right away.

11. Defendant's accountant, Mel Cantor, testified, based on the defendant's records, that a fully-booked manicurist would generate revenue of $15 per half hour, or $240 per day. The average revenue for the two manicurists who worked on September 29 was $256. This amount, Cantor testified, would have been likely to have been attained only if the manicurists were fully booked and, in fact, had worked overtime.

On the other hand, an esthetician fully booked could generate from $330 to $660, depending on the length of the appointments. The average revenue for the four estheticians who worked on September 29 was $436. Thus, one can draw no

55. It is also noteworthy that on the two preceding Saturdays, one of the estheticians was on vacation, despite Ilona of Hungary's professed policy that vacations must be taken during the slow, summer season. Taken with the other evidence that September 29 was a normal Saturday, this evidence further indicates that Ilona of Hungary did not require all five of its estheticians on September 29 to meet customer demand.

56. On the other hand, the weight of the evidence is that Gold could have rescheduled and rearranged Tomilina's and Glukhovsky's September 29 appointments if she had been given authorization to do so soon after the requests for the day off were made. Although Gold testified at trial that it would require at least a month's notice, her deposition testimony that ten days notice would have been sufficient impeached her and was more credible.

57. It is also significant that Ilona of Hungary witnesses attested that both Tomilina and Glukhovsky had loyal clients who wanted only them. In this situation, it is likely that a customer who did not care to see another person on September 29 would have been willing to reschedule.

58. Ilona of Hungary has asserted that Glukhovsky was fired because her failure to work on September 29 was simply the last straw on a load of great transgressions. The notice of termination reflects violations of work rules as an additional reason for the discharge. There is some evidence that Glukhovsky had become dissatisfied with her job and had broken some of the work rules during the few months preceding the termi-

nation. She had received several notes about improper practices (such as improper cleanliness, unauthorized break) in 1990. The most significant incident was a one-Saturday suspension which occurred years earlier, in 1984.

59. The assertion, however, that the Meszaroses were considering firing Glukhovsky apart from the September 29 incident is simply not credible. In addition, George Meszaros admitted in written correspondence to the EEOC and others, as well as in testimony before the Illinois Department of Employment Security, that the only reason Tomilina and Glukhovsky were terminated was their failure to appear at work on September 29, 1990.[12]

60. This is further supported by defendant's witnesses, who were of one mind that Glukhovsky was an outstanding esthetician with a strong customer base,[13] and by Ilona Meszaros, who admitted that she had never fired any estheticians for the purported violations for which Glukhovsky was cited.

61. Similarly, Ilona of Hungary has asserted that Tomilina had committed sufficient work violations that she would have been fired anyhow. This is not credible where Ilona of Hungary concedes that Tomilina had a loyal customer base, indeed, "the largest following of clients." Defendant's Proposed Finding of Fact No. C(1) 8. The assertion that Tomilina was headed for termination apart from the September 29 incident is simply not credible.

62. Ilona of Hungary employs persons of the Jewish faith as well as other faiths and

conclusion that the salon was particularly busy for the estheticians on September 29.

August 25, the day of the discount special with the highest revenues, was an example of an extremely busy day. The average revenue generated by each esthetician was $612 on August 25. If each of the four estheticians was equally busy on September 29, their revenue would have been $2,448, approximately $700 greater than actual, which further indicates that the day was not fully booked.

**12.** In addition, Ilona Meszaros testified that she did not fire Glukhovsky earlier because she believed that Glukhovsky wanted to be fired. This testimony was contradicted by the testimony of Ruth Mayor, who testified that long after Gluk-

hovsky was fired, Mayor informed the Meszaroses that Mayor believed Glukhovsky wanted to be fired and that, in response, the Meszaroses indicated that they were surprised and knew nothing of this information.

**13.** Defendant's Proposed Findings of Fact at 49, ¶ 28, describe Glukhovsky as having "... a high number of clients ... who preferred not to be serviced by other estheticians ... [and having] special expertise and skill with acne patients and with clients recovering from plastic or reconstructive surgery." Defendant offered testimony that European estheticians were very difficult to find and that it would have been impossible to hire a temporary worker to replace Glukhovsky on September 29.

makes no effort to distinguish them based on their religious beliefs. Ilona of Hungary has on other occasions accommodated the religious beliefs of other employees, including those who have asked to take the day off to observe Yom Kippur. Ilona of Hungary allowed a non-service employee in the New York salon to take that day off in 1990.

63. At all times material to this action, the "Company Benefits" section of defendant's employment manual provided, "If for religious reasons, an additional day off is requested, ILONA OF HUNGARY will cooperate provided advance notice is given. Wages for such days off will not be paid."

64. On or about October 5, 1990, the Meszaroses ordered all employees of its Chicago facility to return their employment manuals to Gold on or by the morning of October 6, 1990.

65. As the Meszaroses had requested, Tomilina and Glukhovsky turned their employment manuals in to Gold the morning of October 6, 1990.

66. Between September 29, 1990 and October 6, 1990, George Meszaros contacted the EEOC's Denver office and the Colorado Department of Human Rights requesting advice regarding whether he could fire Tomilina and Glukhovsky for failing to show up for work on Yom Kippur. The Meszaroses testified that based on these discussions, they believed in good faith they could lawfully fire Glukhovsky and Tomilina for that reason.

67. In 1990, Ilona of Hungary was struggling against about three years of unprofitability, in large measure because it had opened two new salons which were not yet on their feet. In September of 1990, the Meszaroses were very concerned about the situation and doing what they could to cut expenses and to enhance revenues throughout the company, including the Chicago salon.

68. For example, at some time before the incidents at issue here arose, Ilona of Hungary eliminated pay for sick days and birthdays on which employees were permitted not to work. To enhance revenues during the typically slow summer season, Ilona of Hungary advertised a price discount on facials in the Chicago salon for the month of August, 1990.

In addition, Ilona Meszaros came to Chicago during the month of August to lend her prestige to the promotion. Ilona of Hungary also published an advertisement in the Sunday *Chicago Tribune* during September which promoted gift certificates and services, without a price discount. Despite the belt tightening, however, employees in the Chicago salon (and elsewhere) continued to receive raises and no one was laid off.

69. When the Meszaroses learned of the requests of Tomilina and Glukhovsky for the day off on September 29, their concern about the company's financial situation entered into their decision.

70. The EEOC offered the testimony of Professor Stuart Meyer, Professor at the Kellogg Graduate School of Management, Northwestern University, as an expert in small business finances. Professor Meyer testified that, in his opinion, defendant would have incurred no financial loss if it had accommodated Tomilina and Glukhovsky by permitting them to take Yom Kippur off from work in 1990, and that there is no evidence that defendant incurred a financial loss as the result of Tomilina's and Glukhovsky's absence from work on Yom Kippur.

71. Meyer testified that, based on defendant's financial records, there was no statistically significant correlation between the number of estheticians or manicurists working on a given day at defendant's facility, and the amount of revenues generated by estheticians or manicurists that same day.

72. Meyer also testified that the conclusion that there was no such correlation is to be expected in firms such as defendant's in which revenues are limited by demand for services, rather than by the supply of persons to perform services.

73. In other words, Meyer's view was that the demand for defendant's services does not necessarily increase because the supply of persons to perform services increases; rather, to maximize efficiency and profit, defendant is best served by providing just enough workers to meet the demand for a particular service on a given day.

74. In conducting his analysis, Meyer studied the Saturdays immediately before

and immediately after Yom Kippur, 1990, given that defendant admitted that its business varied by season.

75. Meyer demonstrated that, when looking at the revenues generated on Saturdays before and after September 29, 1990, the revenues generated by estheticians and manicurists did not increase as the number of estheticians and/or manicurists staffed on a particular Saturday increased.

76. For instance, defendant's esthetician revenues on Saturdays on which it staffed five estheticians (August 25, $3,061; September 1, $1,803; September 8, $1,848; and October 6, 1990, $1,525), did not vary significantly from Saturdays on which defendant staffed four estheticians (August 11, $1,658; August 18, $2,422; September 15, $1,778; September 22, $1,640; September 29, $1,742, and each Saturday from October 13 through November 24, ranging from a low of $1,172 on November 3 to a high of $2,025 on November 17), except for August 25. Professor Meyer believed the large increase in revenue on August 25 was attributable to the price discount defendant had offered.

77. In fact, defendant at times generated more revenue on Saturdays when it staffed its facility with four estheticians than when five estheticians were on duty. For example, the esthetician revenue in Chicago on Yom Kippur 1990, September 29, when four estheticians were on duty, $1,742, was greater than that of Saturday, October 6, $1,525, when five estheticians were on duty.

78. Defendant's records further reflect that of the seven Saturdays preceding September 29, 1990, during which time defendant employed five estheticians, only four of the five estheticians worked on four of those Saturdays (August 11, August 18, September 15 and September 22); defendant staffed its facility with all five of its estheticians on only three of those Saturdays (August 25, September 1 and September 8).

79. It was Meyer's opinion that the fact that defendant required all five of its estheticians to work on only three of the seven Saturdays preceding Yom Kippur 1990 undercut any claim by defendant that it would have incurred a financial loss by accommodating Tomilina's and Glukhovksy's request, or that defendant in fact incurred a financial loss by Tomilina's and Glukhovsky's absence on September 29 after failing to accommodate their requests.

80. Similarly, Meyer testified that defendant's manicurist revenues on Saturdays on which it staffed three manicurists (each Saturday from August 11 through September 22 and October 6) did not vary significantly from Saturdays on which defendant staffed two manicurists (September 29 and October 13).

81. In fact, defendant at times generated more revenue on Saturdays when it staffed its facility with two manicurists than when three manicurists were on duty. For instance, defendant's manicurist revenue in Chicago on September 29, when two manicurists were on duty, was $512; the previous Saturday, September 22, three manicurists were on duty and defendant received $371 in revenue from services performed by manicurists, and on October 6, defendant received $490 in manicurist revenue.

82. Meyer also testified that, while there is no evidence that defendant incurred any financial loss as the result of Tomilina's and Glukhovsky's absence on Yom Kippur 1990, defendant could have ensured that any loss that defendant might have *expected* to incur from their absence on Yom Kippur would have been eliminated or minimized by accommodating in advance their requests for Yom Kippur off from work.

83. Meyer testified that defendant could have easily accommodated the religious practices of Tomilina and Glukhovsky by reassigning or rescheduling in advance any customers then booked to be serviced by them, without incurring any financial loss, and such accommodations are regularly offered by firms similar to defendant for religious and non-religious reasons alike.

84. In his opinion, by refusing to accommodate Tomilina's and Glukhovsky's request to take Yom Kippur off from work, defendant actually increased the possibility that defendant would encounter a loss of revenue.

85. Defendant offered evidence of the financial loss it suffered because of Tomilina's

and Glukhovsky's absence on September 29, 1990. Defendant's business accountant, Mel Cantor, relied on (1) testimony of Ilona of Hungary employees who recalled that September 29 was an exceptionally busy day; (2) he then assumed that because it was an exceptionally busy day, every manicurist and every esthetician was fully booked that day (or at least as busy as on Ilona of Hungary's busiest recent Saturdays); (3) he then calculated the revenue that would have been generated by three fully-booked manicurists and five fully-booked estheticians (or at least the revenue generated on the busiest Saturdays); and (4) he subtracted the actual revenues on September 29 from the maximum possible revenue. In addition, he considered that the product sales that normally accompany service revenue were lost. Cantor believed that total lost revenue due to Tomilina's absence was approximately $320 and to Glukhovsky, approximately $616. Deducting Tomilina's $60 salary and Glukhovsky's $107 salary and commissions, the net loss to the company, Cantor testified, was $769.[14]

86. The total income of the Chicago salon for the 1990–91 fiscal year was $623,068.20 (Pl. Exhibit 78).

87. Cantor believed that certain inefficiency results from any employee absence which could result in a complete loss of revenue. For example, a client unable to be serviced on the day requested might choose another salon (although Ilona of Hungary considers itself unique); or, while one customer might reschedule or transfer to another person in the salon, another might simply skip that appointment.

88. Three other Ilona of Hungary employees in Chicago were of the Jewish religion. Only one had asked for the day off, but the Meszaroses believed that if they had granted the day to Tomilina or Glukhovsky, fairness would have required them to grant it

to others who might have asked. Cantor testified that this would have caused even greater harm to Ilona of Hungary than the absence of only two employees.

89. Cantor's testimony regarding the financial loss incurred by defendant pertained only to the loss incurred by defendant as the result of its *failure* to accommodate Tomilina's and Glukhovsky's religious practices. Cantor did not explain whether or to what extent defendant would have incurred a financial loss or other hardship if it had accommodated Tomilina's and Glukhovsky's religious practices by allowing them the day off when they requested it.

90. Defendant put forth no evidence that it would have incurred any hardship, financial or otherwise, had it *accommodated* Tomilina's and Glukhovsky's requests for time off from work to observe Yom Kippur 1990 in advance.

91. The Meszaroses did not consider any alternatives which would have reasonably accommodated either Tomilina's or Glukhovsky's religious practices.

92. Defendant treated Tomilina's and Glukhovsky's request for a Saturday off for religious reasons differently from the way it treated numerous requests made by other employees for Saturdays off for non-religious reasons. Apart from sickness leave, employees who did not work for personal reasons other than their religious beliefs were not fired and suffered no adverse employment consequences as the result of their absences. For example:

(a) On Saturday, December 16, 1989, defendant allowed Constance Russell, an esthetician at its Costa Mesa facility to take time off from work for non-religious reasons. Defendant did not ter-

---

14. Cantor's testimony was also based on the testimony of Gold and other employees that only one of Glukhovsky's clients could be rescheduled on September 29, that most of her clients would see no one but Glukhovsky, that Glukhovsky was in fact fully booked on September 29, and all but one were turned away, as well as walk-in clients. Cantor testified that his opinion was also based on the assumption that Tomilina had appointments booked and that all were turned away

rather than rescheduled or transferred. This is, of course, not likely where the two remaining manicurists had exceptionally high revenues that day, suggesting they absorbed at least some of Tomilina's customers. All of this evidence derives from the memory of the witnesses which, in each case, was in the court's view somewhat biased toward the employer and based on more certain memory of a long past event than the court would expect.

minate Constance Russell for her absence on December 16, 1989.

(b) On Saturday, April 6, 1991, defendant allowed Gabriela Altamirano, an esthetician at its Costa Mesa facility, to take time off from work to attend her sister's wedding. Defendant did not terminate Gabriela Altamirano for her absence on April 6, 1991.

(c) On Thursday, December 5, 1991 through Sunday, December 8, 1991, defendant allowed Gabriela Altamirano to take time off from work to attend her sister's wedding. Defendant did not terminate Gabriela Altamirano for her absence on Saturday, December 7.

(d) On Saturday, December 23, 1989, defendant allowed Stacy Smith, a beauty advisor at its Chicago facility, time off from work, without any advance notice being given, due to a family emergency. Defendant did not terminate Stacy Smith for her absence on December 23, 1989.

(e) On Saturday, May 30, 1992, defendant allowed Shala Murphy, an esthetician at its Chicago facility, time off from work, without any advance notice being given, due to a "family emergency." Defendant did not terminate Shala Murphy for her absence on May 30, 1992.

(f) In December 1991, defendant allowed Barbara Holota, one of two manicurists at defendant's Chicago facility, one month off from work to go to Europe. (Defendant's policy required vacations to be taken during the slow, summer season.) Defendant did not terminate Barbara Holota for her one month's absence in December 1991.

(g) On Sunday, May 12 through Saturday, May 18, 1991, defendant allowed Manizheh Arab, an esthetician at its Costa Mesa facility, time off from work due to the illness of Ms. Arab's family members. Defendant did not terminate Manizheh Arab for her absence on Saturday, May 18, 1991.

93. Ilona of Hungary is closed on Sundays and on Christmas Day, which accommodates the principal religious observances of Christians.

94. Had defendant not unlawfully terminated Tomilina on October 6, 1990, she would have continued to work for defendant.

95. Tomilina earned $300 per week at the time she was terminated by defendant.

96. At the time she was terminated by defendant, Tomilina had accrued one week's vacation, for which she would have been paid $300; Tomilina did not receive the value of her vacation pay after being terminated by defendant.

97. Tomilina used reasonable and diligent efforts to obtain other employment following her discharge by defendant on October 6, 1990.

98. Tomilina did not obtain other employment after being terminated by defendant until December 12, 1990, nine weeks and four days after her termination, during which time she would have earned a total of $2,940.00 at defendant ($300 per week times nine weeks, plus $60 per day times four days).

99. After being terminated by defendant, Tomilina obtained other employment with Olga's Skin Care, where she has worked from December 12, 1990 to the present.

100. The amount of Tomilina's net back pay lost, including the value of accrued vacation, totals $3,240.00 ($2,940.00 for the period October 6, 1990 to December 12, 1990, plus $300 vacation pay) during her back pay period.

101. Had defendant not terminated Glukhovsky's employment on October 6, 1990, she would have continued to work for defendant indefinitely.

102. After she was terminated, and for a period of approximately six months, Glukhovsky testified, she diligently sought employment at a number of salons, including Chanel, Cote D'Or, Georgette Klinger, and others, as well as department store salons, in the Gold Coast area, without success. She also looked for work in north suburban locations, without success.

103. After six months, Glukhovsky testified, she felt her application had been filed with most potential employers and she discontinued an active job search.

104. The court believes Glukhovsky's testimony that she sought employment for a period of time after her discharge, although doubts that the search continued for six months.

105. Glukhovsky has used and continued to use reasonable and diligent efforts to obtain other employment following her discharge by defendant on October 6, 1990. Specifically, Glukhovsky began employment in her own business in January, 1991.

106. In December, 1989, Glukhovsky and her husband acquired a Subway sandwich shop franchise. During the year 1990, while still employed at Ilona of Hungary, Glukhovsky engaged in an effort to obtain the zoning permit and attend to other matters to get the business up and running.

107. Glukhovsky intended to continue working at Ilona of Hungary until the income from the Subway was sufficient to replace her own and her husband's income from employment.

108. The Subway franchise opened in January 1991. For the first seven or eight months of operations, Glukhovsky and her husband together managed and operated the store with the help of one or more employees. During those months, Glukhovsky's husband continued his employment as a cab driver, starting at 4:00 a.m. Either Glukhovsky or her husband was present in the store during operating hours, 10:00 a.m. to 10:00 p.m. Glukhovsky took care of her child after school.

109. Glukhovsky devoted considerable time and effort to overseeing the operations of the Subway franchise. Glukhovsky conceded that she went to the Subway on a daily basis in 1991, that she handled the paperwork for the business and oversaw the operations of the shop for a few hours. She also removed her son from child care in order to cut her family expenses, and she devoted part of her time to his care.

110. Glukhovsky hired a manager, not herself, in July or August 1991.

111. In 1992, Glukhovsky and her husband also obtained a pizza restaurant. Glukhovsky's husband was and continues to be principally responsible for the operations of the pizza restaurant while Glukhovsky was and is principally responsible for the Subway.

112. In 1993, Glukhovsky was offered a job in Highland Park, which she declined because the terms were unsatisfactory.

113. At present, Glukhovsky testified, she spends about one to two hours at the Subway and she devotes about three hours a day to the business. This is because a Subway is "very easy to control."

114. When seeking her zoning permit, Glukhovsky testified to the Evanston Zoning Board, "I am the one who is going to run the shop."

115. Glukhovsky's testimony minimizing the amount of time spent at the Subway so as to suggest that she could have maintained her full time work at Ilona of Hungary while also starting a new business is not credible. Although she may well not have quit her job in order to operate the franchise, the weight of the evidence is that once she was fired, and after a brief period of looking for work, she devoted her work life to running the business and attending to her child.[15]

116. The evidence that Glukhovsky continued diligently to seek other work in 1991 continuing to the present is not credible.

117. Glukhovsky and her husband together made more personal income in 1991 from Mr. Glukhovsky's employment, corporate compensation and profits, than they did in 1990 from their employment.

118. Glukhovsky earned an average of $447.50 per week in salary and commission at the time she was terminated by defendant.

119. Glukhovsky incurred an additional expense valued at $20.66 per week for health

---

15. The fact that Glukhovsky did not hire a manager until July or August, 1991, further supports a conclusion that Glukhovsky was managing the store. The fact that she hired a manager also suggests that such a function was needed and was filled by her prior to hiring a manager.

insurance premiums previously paid for by defendant, an amount totalling $309.90.

## CONCLUSIONS OF FACT AND LAW

Title VII prohibits an employer from discriminating against an employee, with respect to terms, conditions or privileges of employment, because of the employee's religion, 42 U.S.C. § 2000e–2(a)(1), unless the employer can show that "he is unable to reasonably accommodate an employee's or prospective employee's religious observation or practice without undue hardship on the conduct of the employer's business." *Id.* at § 2000e(j). (In a curious use of language) § 2000e(j) recites that "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." This section has been interpreted to mean "that an employer, short of 'undue hardship,' [is required to] make 'reasonable accommodations' to the religious needs of its employees." *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 66, 97 S.Ct. 2264, 2268, 53 L.Ed.2d 113 (1977). The courts have described the *prima facie* case of religious discrimination as requiring a plaintiff to show that (1) the discharged employee's practices were religious; (2) the employee called the religious practice to the attention of the employer; and (3) the religious practice was the basis for the discharge. *Drazewski v. Waukegan Development Center,* 651 F.Supp. 754, 756 (N.D.Ill.1986), *citing, Baz v. Walters,* 782 F.2d 701, 706 & n. 5 (7th Cir.1986).

■ EEOC has demonstrated that Tomilina and Glukhovsky requested a day off for observance of a sincerely held religious practice, that defendant denied their requests without any effort to accommodate their religious practice, and that defendant fired them after they chose to miss work rather than forgo their religious observance. Defendant has disputed the sincerity of Glukhovsky's religious belief, but, as indicated in the Findings of Fact, the court has resolved this issue in favor of EEOC and found her beliefs to be sincere. Defendant has also suggested that it did accommodate Glukhovsky and Tomilina by offering them another day off, but because Yom Kippur is not a moveable day, this was no accommodation at all.

■ The principal issue in dispute is one of fact, whether Ilona of Hungary was excused from its obligation to reasonably accommodate Tomilina's and Glukhovsky's requests because to do so would have caused undue hardship on the conduct of the employer's business. Defendant has proffered several reasons why accommodation would have caused it undue hardship.

First, defendant has suggested the requests came but a few days before the requested day off, making it most difficult, if not impossible, to rearrange the employees' schedules. As indicated in the Findings of Fact, the preponderance of the evidence does not support this assertion. The court has found that ten days notice would have been sufficient to make arrangements and that both Tomilina and Glukhovsky made their requests more than ten days in advance.

Second, defendant has suggested that even if it would have been possible to accommodate Glukhovsky and Tomilina, three other employees would have or might also have asked for the day off if Glukhovsky's and Tomilina's requests had been granted. Although this would have been a natural concern of a fair-minded employer, the employer here made a judgment that no request could be honored without considering what it could reasonably do to accommodate the requests. For example, Glukhovsky was the only esthetician who wanted to observe Yom Kippur. If Ilona of Hungary had decided to honor her request but denied it to Tomilina because it was unable, after considering available alternatives, to accommodate her and Sophia Kapmar and also meet the demands of the business, a different picture might emerge here. As it stands, the record suggests that defendant's argument is merely a rationalization of its refusal to accommodate the requests that were actually made and suggests strongly that the Meszaroses did not consider the requests important enough to bother with.

Third, defendant has contended that it could not afford to accommodate the requests because the business was losing money at the time. Defendant relies on *Hardison* for the principle that to require the employer to bear more than a *de minimus* cost in order to accommodate an employee's religion would be an undue hardship. *Hardison*, 432 U.S. at 84, 97 S.Ct. at 2277. In *Hardison*, the accommodation requested was absence from work every Saturday, in an airline facility open 24 hours a day, 365 days a year, with the necessity that the job be filled at all times. The Court concluded that Title VII did not "require an employer to discriminate against some employees in order to enable others to observe their Sabbath." It observed, "[T]o require TWA to bear additional costs when no such costs are incurred to give other employees the days off that they want would involve unequal treatment of employees on the basis of their religion." *Id.* The situation at Ilona of Hungary was different from that at TWA in *Hardison*. Tomilina and Glukhovsky requested one day off for an annual religious observance which in 1990 fell on a Saturday, not every Saturday, not even every year. The salons were closed on Sundays and on Christmas days, so that employees who practiced mainstream Christianity were already reasonably accommodated, in contrast to the TWA facility that was open at all times. Most significantly, there is ample evidence that employees at Ilona of Hungary were in fact given days off, including Saturdays off, for personal reasons other than their religion, in contrast to the unequal favorable treatment of religious requests which concerned the Court in *Hardison*. So it is questionable whether the Court's statements in *Hardison* about the inefficacy of solving the problem with money really apply here.[16]

Fourth, even assuming that Ilona of Hungary, which had accommodated other employees' requests for Saturdays off, was not required to accommodate Glukhovsky and Tomilina if the cost was more than *de minimus*, the court finds that it has not established its proof. Defendant's evidence, which

presented a "worst case scenario" of events on September 29, 1990, established a $769 loss. It presented no evidence, however, demonstrating that if it had attempted in advance to reschedule Glukhovsky's and Tomilina's appointments already made and to schedule new appointments on alternative dates or with other estheticians and manicurists on September 29, it would have incurred more than a *de minimus* cost. Mr. Cantor's testimony was based on an assumption that was not well founded: that both Glukhovsky and Tomilina (and all others, as well) were in fact fully booked. Because the evidence is persuasive that this was not true, Cantor's estimate of losses was faulty, although not particularly significant in amount even at that.

The testimony of Professor Meyer was more persuasive that whatever losses actually occurred, if any, they could have readily been avoided because revenues at Ilona of Hungary do not necessarily increase with the number of estheticians or manicurists available. This is corroborated by the evidence that Ilona of Hungary continued for nine months without replacing Glukhovsky. The evidence as a whole leads to the conclusion that had Ilona of Hungary accommodated Glukhovsky's and Tomilina's requests, at most the loss would have been the inefficiency resulting, as Mr. Cantor testified, from the mere absence itself. This type of loss is indeed *de minimus*.

Fifth, defendant has argued that even if it actually could have afforded to give Glukhovsky and Tomilina the day off, but the Meszaroses believed in good faith it could not afford it, Ilona of Hungary is excused from the reasonable accommodation requirement. Defendant relies on *Howard v. Haverty Furniture Cos.*, 615 F.2d 203 (5th Cir.1980); *Johnson v. United States Postal Service*, 364 F.Supp. 37 (N.D.Fla.1973); and *Wisner v. Truck Central, Subsidiary of Saunders Leasing Systems*, 784 F.2d 1571 (11th Cir. 1986). None of these cases state the principle for which they are cited. *Howard* held that an employer had reasonably denied an

---

16. *Beadle v. City of Tampa*, 42 F.3d 633 (11th Cir.1995), which defendant cites, is very similar to *Hardison*. It affirmed ruling that 24 hour-a-day, every day of year police department was not

required to grant shift exceptions that would result in greater than *de minimus* cost. The case before this court is readily distinguishable.

employee's request for a day off to attend to his other employment as a minister where plaintiff's religion would have permitted a substitute minister to officiate at the funeral, but plaintiff made no effort to obtain one or to arrange the funeral at a time when it would not conflict with his work for the defendant. "The fact that [defendant] incurred no direct money cost from plaintiff's absence [was] not controlling," the court added. *Howard,* 615 F.2d at 205. The facts of *Howard* are so substantially different from those presented here that the case is not instructive. Likewise, *Johnson* does not indicate that good faith is a defense. There, much like *Hardison,* the court concluded that the employer had made a "good faith effort" to accommodate the plaintiff but that it was not required to accommodate him where to do so would require more senior employees to be subordinated to plaintiff. Here, by contrast, Ilona of Hungary did not make a good faith effort to accommodate Glukhovsky and Tomilina. *Wisner,* as well, involved a distinguishable situation where the employer did make sincere efforts to accommodate the employee, including a lateral transfer which would not have required her to work on Saturdays but which the employee had rejected. The court concludes that defendant has failed to establish that accommodation of Glukhovsky's and Tomilina's request for a day off for religious observance would have created undue hardship.

Finally, defendant has argued that it did not actually fire Tomilina and Glukhovsky because they did not come to work on Yom Kippur, but rather that they fired them (1) for insubordination for not coming to work, or (2) Glukhovsky, in any event, would have been fired anyhow for other work rule violations. With regard to (1), the refusal to come to work is inextricably linked with the religious observance. The policy underlying the religious discrimination provisions of Title VII is to protect an employee from having to disobey her God in order to obey her employer. *See Hardison,* 432 U.S. at 87, 97 S.Ct. at 2278, *dissenting opinion* ("... [A] society that truly values religious pluralism cannot compel adherents of minority religions to make the cruel choice of surrendering their religion or their job.") Virtually all of the cited cases entail a situation in which an employee was discharged after refusing to work in violation of his religious principles. With regard to (2), as the Findings of Fact indicate, the evidence that Glukhovsky would have been fired in any event is not credible. From one side of its mouth defendant has argued that Glukhovsky was a highly valued, competent employee while from the other it contends that she was only marginal. It stands to reason that a good employee, whose skills are hard to find, who is making money for the employer, is not likely to be fired for work rule violations for which no one else had ever been fired. For these reasons, the court concludes as a matter of law that the proffered explanations for the discharge of Glukhovsky and Tomilina are pretextual.

### *RELIEF*

EEOC seeks an award of back pay for Tomilina for the period during which she was unemployed after October 6, 1995. For Glukhovsky, EEOC seeks an order of immediate reinstatement, with retroactive benefits and seniority intact, or in the alternative, front pay to Glukhovsky until such an offer of reinstatement is accepted or rejected. In addition, EEOC seeks an injunction against further discrimination by Ilona of Hungary, including an order requiring the posting of notices in all of the salons concerning a judgment in this case and the relief ordered by the court, retention of records of all requests for time off for religious purposes, and periodic reports to the EEOC concerning such requests and the action thereon.

Title VII, § 706(g), 42 U.S.C. § 2000e–5(g), vests broad discretion in the federal courts to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate." *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976). With regard to Tomalina, the court agrees that she is entitled to an award of back pay for wages and vacation pay lost as a result of

the events at issue in the amount of $3,240, plus prejudgment interest. *See Hutchison v. Amateur Elec. Supply,* 42 F.3d 1037, 1046 (7th Cir.1994) ("Prejudgment interest is an element of complete compensation and a normal incident of relief under Title VII."). Tomalina does not seek reinstatement.

 Concerning Glukhovsky, as the Finding of Facts indicate, the court finds that Glukhovsky would not have left her job voluntarily at Ilona of Hungary and is thus entitled to an award of back pay for the entire period, including benefits. This amount must, however, be reduced by the amount of Glukhovsky's interim earnings from her businesses.[17] Glukhovksy is also entitled to prejudgment interest.

Glukhovsky is further entitled to reinstatement to all benefits of her employment on the same terms as existed on September 29, 1990 and as would have inured to her had she remained to the present.[18] Glukhovsky is entitled to "front pay" from the date of judgment until the date the offer of reinstatement is presented and thereafter until Glukhovsky shall be allowed to return to work. If the offer is outstanding for 14 days and is not accepted, it may be withdrawn and the order for front pay shall be void.

 Concerning the injunction, the court agrees with EEOC that an injunction is proper which shall permanently restrain defendant from discriminating against employees on the basis of their religion. *See Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546 (11th Cir.1986) (In cases presenting abundant evidence of consistent past discrimination, injunctive relief is mandatory absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law.) Although the court has no evidence of prior incidents such as these, where in response to the events at issue here, the defendant withdrew its employment manual which provided a policy of accommodation, an injunction is appropriate. EEOC is also entitled to the monitoring provisions it requests for a three-year period, as follows:

Ilona of Hungary, Inc., shall report to the EEOC every six (6) months regarding its employees' requests for time off, including:

a. identity of employee making the request;

b. position of employee making the request;

c. location of facility which employs the requesting employee;

d. nature of the employee's request;

e. whether the request was granted or denied;

f. identity of person(s) who made the decision to grant or deny the request; and

g. if the request is denied, all efforts made to accommodate the request and the reasons for the denial.

The EEOC is awarded its costs incurred in this action. Fed.R.Civ.P. 54(d).

The parties are directed to prepare an agreed form order of injunction in conformity with this decision and to present it to the court for entry on April 27, 1995, at 10:00 a.m.

---

**17.** Glukhovsky's earnings may be derived from tax returns, excluding that portion allocable to her husband's other employment. Income from any businesses jointly held by them should be allocated on a 50–50 basis unless they have filed separate returns.

**18.** EEOC asks for reinstatement of seniority. There is no evidence, however, that Glukhovsky had any seniority rights under a collective bargaining agreement or otherwise.