EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff–Appellee,

v.

ILONA OF HUNGARY, INCORPORATED, Defendant–Appellant.

No. 95–2935.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 21, 1996.

Decided Oct. 2, 1996.

---

Paula R. Bruner (argued), Equal Employment Opportunity Commission, Office of General Counsel, Washington, DC, Sharon A. Seeley, Julianne Bowman, Dana Hutter, June Wallace Carson, Equal Employment Opportunity Commission, Chicago, IL, for Plaintiff-Appellee.

Aimee B. Storin, Phelan, Cahill & Quinlan, Chicago, IL, Paul Szigetvari, Rolling Meadows, IL, Scott B. Greene (argued), Cahill, Christian & Kunkle, Chicago, IL, for Defendant-Appellant.

Before BAUER, KANNE, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

We consider in this appeal the extent to which an employer must accommodate its employees' religious practices under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). Lyudmila Tomilina and Alina Glukhovsky were employed by defendant Ilona of Hungary, Inc. ("Ilona") in its Chicago beauty salon, Tomilina as a manicurist and Glukhovsky as a skin care specialist or "esthetician." Tomilina and Glukhovsky are Jewish, and both asked to take the day off without pay on Saturday, September 29, 1990, in order to observe Yom Kippur, a Jewish holy day. Ilona refused their requests and when neither employee appeared for work on Yom Kippur, decided to terminate their employment. Tomilina and Glukhovsky filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC" or "Commission"), which commenced this action in federal court. *See* 42 U.S.C. § 2000e–5(f)(1). Following a bench trial, the district court entered judgment for the Commission on the basis of detailed findings of fact and conclusions of law. *See EEOC v. Ilona of Hungary, Inc.,* 885 F.Supp. 1111 (N.D.Ill.1995). The court awarded back pay to Tomilina and Glukhovsky and ordered that Glukhovsky be reinstated. The court also granted the Commission's request for a permanent injunction that, *inter alia,* prohibits Ilona from engaging in any practice that discriminates on the basis of religion. In this appeal, Ilona challenges the finding of a Title VII violation as well as certain aspects of the relief afforded below. We affirm in part and reverse in part.

I.

As we said, the district court issued detailed written findings after conducting a six-day bench trial. Our description of the factual background underlying the Commission's claim relies on those findings, but notes, where appropriate, the contrary evidence rejected by the lower court.

Ilona is owned by George and Ilona Meszaros, who immigrated to this country from Hungary approximately forty years ago. In 1971, the Meszaroses opened the first Ilona salon in Denver, Colorado. They subsequently opened salons in a number of other cities, including the salon at issue here located at 45 East Oak Street in Chicago. Ilona offers three major services at its Chicago salon: nail care provided by manicurists, skin care provided by estheticians, and body care provided by masseuses. Ilona also manufactures and sells to its customers a proprietary line of skin and nail care products used in its salons.

Ilona generally hires manicurists, estheticians, and masseuses who were trained in Europe, as it believes that European-trained service personnel are more qualified than their domestically-trained counterparts. Tomilina and Glukhovsky are cases in point, as both came to the United States as Jewish refugees from the former Soviet Union, where Tomilina had received formal training in nail care and Glukhovsky in skin care.

Tomilina came to this country in 1989 and began working as a manicurist in Ilona's Chicago salon in August of that year. In early October, Tomilina asked the salon's manager if she would be permitted to take the day off on Yom Kippur, which in 1989 fell on October 9. Because her request was made only a few days before the holiday, however, the salon's manager refused to allow Tomilina to take the entire day off, but instead permitted her to miss two hours in the morning while she attended religious services. At the time, Ilona's employee manual indicated that if an employee requested a day off for religious reasons, the company would "cooperate" with the request "provided advance notice [was] given." Employees were not paid, however, when they took a day off for religious reasons.

The following year, Tomilina decided to make her request at least two weeks in advance. Thus, on or about September 13, 1990, Tomilina asked Theresa Gold, who then managed the Chicago salon, for permission to take the day off on Saturday, September 29, 1990 to observe Yom Kippur. Tomilina made this request because she sincerely believed that members of the Jewish faith should refrain from working on their day of atonement. Gold did not question the sincerity of Tomilina's religious beliefs but said that she would pass along the request to the Meszaroses.[1] Gold then informed the Meszaroses of Tomilina's request, noting as well that Tomilina was already partially booked with appointments on that Saturday. The Meszaroses instructed Gold to deny the request, which Gold did. Gold also continued, then, to schedule additional appointments for Tomilina on September 29. Yet Tomilina apparently did not understand that her request had been denied,[2] and she therefore did not report to work on Yom Kippur.

Glukhovsky's story is similar. She came to the United States with her husband in 1981 to escape anti-Semitism in the Soviet Union. She was hired by Ilona in November 1982 as an esthetician. Prior to September 1990, Glukhovsky had never requested a day off from work for religious reasons. Indeed, she had represented to co-workers that she was not a particularly religious person. On or about September 13, 1990, however, Glukhovsky asked that she be permitted to be absent from work on Saturday, September 29 in order to observe Yom Kippur. Although Gold did not at the time question the sincerity of Glukhovsky's religious beliefs, that became a hotly contested issue at trial. After considering all of the evidence, the district court found that Glukhovsky's belief that she should refrain from work on Yom Kippur was sincere.[3]

1. Tomilina was one of three manicurists then employed by Ilona's Chicago salon. One other manicurist, Sophie Kapmar, was Jewish and had previously asked Gold for the day off on Yom Kippur. When Gold indicated that Kapmar already had customers scheduled for that day, Kapmar withdrew her request and agreed to work.

2. At the time, Tomilina had only limited abilities with the English language, as she had only been in this country for slightly over a year. The district court attributed Tomilina's lack of understanding to her limited language abilities.

3. Although Glukhovsky conceded that she was not particularly religious and did not observe every Jewish holiday, she emphasized that for a number of reasons, her religion had become increasingly important in recent years. First, in 1983, Glukhovsky's mother-in-law died, and she observed that her husband's devout faith enabled him to cope with that loss. The following year, Glukhovsky gave birth to a son, and she wanted him to grow up as part of a religious community. Finally, in 1985, Glukhovsky's father died in Russia, and as his only child, she began to say prayers in remembrance of him. After her father's passing, Glukhovsky regularly attended services on Yom Kippur, except in 1987, when she was scheduled to work. In 1986 and 1989, Yom Kippur fell on Glukhovsky's regular day off. The record does not reveal why Glukhovsky's work schedule did not interfere with Yom Kippur services in 1988, although she apparently did not ask Ilona for that day off.

Gold told Glukhovsky that she would relay her request to the Meszaroses. Like Tomilina, Glukhovsky was already partially booked with appointments for September 29, as were the Chicago salon's four other estheticians.[4] When Gold relayed these facts to the Meszaroses, they instructed Gold to deny Glukhovsky's request. On September 20, Gold communicated that decision to Glukhovsky, who asked if Gold had stressed to the Meszaroses the importance of the holiday to her religion. Glukhovsky even asked if she might speak with the Meszaroses directly. Glukhovsky ultimately told Gold that she would not be reporting to work on September 29 and that Gold should refrain from scheduling any additional appointments for that day. Gold testified, however, that she fully expected Glukhovsky to work on September 29, and she in fact continued to schedule appointments for Glukhovsky.[5] But true to her word, Glukhovsky observed the Yom Kippur holiday on September 29 and did not report for work.

After the holiday, neither Tomilina nor Glukhovsky were scheduled to work on Sunday, September 30 or Monday, October 1. Both returned to work on Tuesday, October 2 and worked their regular schedules through Saturday, October 6. The Meszaroses, meanwhile, were attempting to decide how to respond to the unexcused absences of September 29. George Meszaros contacted the EEOC's Denver office and asked whether he could terminate Tomilina and Glukhovsky for failing to work on Yom Kippur. The Meszaroses ultimately decided that they could and they would. Thus, they instructed Gold to inform Tomilina and Glukhovsky at the close of business on October 6 that their employment was being terminated. Prior to that, however, on October 5, the Meszaroses directed all of Ilona's Chicago employees to return their employment manuals (which included the "cooperation" clause referenced above) by the morning of October 6. At the close of business on that day, having collected the employment manuals, Gold carried out the Meszaroses' wishes, informing Tomilina and Glukhovsky that their employment was being terminated because they had failed to report for work on September 29. Ilona hired a manicurist to replace Tomilina approximately one month later but did not hire an esthetician to replace Glukhovsky until June 1991.

At trial, Ilona maintained that its decision to refuse the requested day off was based not on a failure to accommodate sincerely-held religious beliefs but on legitimate business concerns. First, Ilona emphasized that Saturday is the busiest day of the week in the beauty industry and that the Chicago salon could not afford to operate with less than its full complement of service personnel on that day. The Meszaroses apparently were also concerned with the company's precarious financial condition, as Ilona had been operating at a loss since 1986. Ilona asserted, moreover, that the employment histories of Tomilina and Glukhovsky were less than stellar, and that their failure to appear for work on September 29 was simply the last straw for two employees who would soon have been terminated for other reasons.

The district court found, however, that Ilona had terminated Tomilina and Glukhovsky solely as a result of their failure to appear for work on September 29. The court rejected Ilona's purported reliance on other deficiencies in their work records as pretextual, noting Ilona's admission that both employees had developed large followings of loyal customers and that the company had never before terminated any employee for the deficiencies attributed to Tomilina and Glukhovsky. Those terminations violated Title VII, the court found, because Ilona made no effort to accommodate the employees' religious practices; in fact, it considered no alternatives to simply denying their requests. In that regard, the court found that Ilona had produced no evidence to demonstrate that the company would have incurred any hardship by accommodating the religious re-

---

4. Of the five estheticians employed by Ilona's Chicago salon in September 1990, Glukhovsky was the only one who was Jewish.

5. The district court credited Glukhovsky's version of these events, in part because the record of Glukhovsky's September 29 absence, which Gold had prepared, showed that the absence had been "expected in advance."

quests of Tomilina and Glukhovsky in advance. Indeed, the court found that Gold could easily have rescheduled the existing September 29 appointments of each employee had the Meszaroses authorized her to do so when the requests were made. The court concluded that Ilona's conduct amounted to discrimination on the basis of religion because other employees had not been terminated for being absent from work on a Saturday for nonreligious reasons. To remedy Ilona's violation, the court awarded back pay to both employees and ordered that Glukhovsky be reinstated.[6] The court also granted the Commission's request for injunctive relief.

## II.

■ Title VII makes it unlawful to discharge or otherwise to discriminate against an individual because of that individual's religion. 42 U.S.C. § 2000e–2(a)(1). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Somewhat awkwardly, this definition also gives substance to Title VII's prohibition against religious discrimination by imposing an affirmative duty on employers to reasonably accommodate the religious observances and practices of its employees, unless the employer can demonstrate that such an accommodation would cause undue hardship to the conduct of its business. *Id.*; *see also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 & n. 1, 107 S.Ct. 367, 369 & n. 1, 93 L.Ed.2d 305 (1986); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977). Thus, once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any accommodation would result in undue hardship. *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir.1986); *Redmond v. GAF Corp.*, 574 F.2d 897, 901 (7th Cir. 1978); *see also EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1512 (9th Cir.1989).

## A.

■ In order to establish a prima facie case of religious discrimination, a plaintiff must show that the observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice to her employer's attention, and that the religious observance or practice was the basis for her discharge or other discriminatory treatment. *See EEOC v. United Parcel Serv.*, 94 F.3d 314, 317 (7th Cir.1996); *Wright v. Runyon*, 2 F.3d 214, 216 n. 4 (7th Cir.1993), *cert. denied*, 510 U.S. 1121, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994); *Beasley v. Health Care Serv. Corp.*, 940 F.2d 1085, 1088 (7th Cir.1991); *Baz*, 782 F.2d at 706 & n. 5. There can be little doubt that the Commission succeeded in establishing a prima facie case of religious discrimination here. Ilona nonetheless makes two arguments apparently addressed to this aspect of the Commission's claim. First, Ilona broadly contends that its decision to deny the requests of Tomilina and Glukhovsky for a day off to observe Yom Kippur, and thus its subsequent decision to terminate their employment, was based on legitimate business reasons that were unrelated to the religion of the two employees. Whether or not legitimate business reasons justified the decision, however, is but a variation on the argument we consider below that accommodating the employees' religious requests would have caused undue hardship to Ilona's business. Tomilina and Glukhovsky plainly were terminated for failing to work on Yom Kippur; whether or not Ilona's decision to require that they do so was supported by legitimate concerns for its business goes to the issue of undue hardship, and not to whether a prima facie case was shown.

■ Ilona also questions the sincerity of Glukhovsky's religious beliefs and argues that the district court ignored credible evidence that Glukhovsky was not a religious person. The implication, then, is that Glukhovsky was requesting the day off on Yom Kippur for personal rather than religious

---

**6.** The Commission did not seek reinstatement for Tomilina, as she had secured comparable employment in December 1990.

reasons. That argument does address the Commission's prima facie case, as the sincerity of Glukhovsky's religious beliefs is relevant to whether or not the observance or practice for which an accommodation was requested will be considered "religious" in nature. *See Redmond,* 574 F.2d at 901 & n. 12. In other words, if the religious beliefs that apparently prompted a request are not sincerely held, there has been no showing of a *religious* observance or practice that conflicts with an employment requirement. Yet the lower court's finding on that issue generally will depend on its assessment of the employee's credibility, making it difficult for us to disturb the finding as clearly erroneous. *Cf. In re Krehl,* 86 F.3d 737, 743–44 (7th Cir.1996). That is the case here. Glukhovsky readily conceded that she is not a particularly religious person and that she does not observe every Jewish holiday. Yet she also emphasized that recent family events had caused religion to play an increasingly important role in her life. Those events included her mother-in-law's death, her husband's growing faith, the birth of her son, and the death of her own father in Russia. Since her father's death in 1985, in fact, Glukhovsky had attended services on Yom Kippur in every year except 1987, when her work schedule would not permit it. The district court found Glukhovsky's belief that she should refrain from work on Yom Kippur in 1990 to be sincere, and the record evidence does not leave us with the definite and firm conviction that this finding was in error. *See Redmond,* 574 F.2d at 903. We thus agree that the Commission established a prima facie case of religious discrimination and proceed to consider the issues of reasonable accommodation and undue hardship.

### B.

The burden of making a reasonable accommodation or of showing that any accommodation would result in undue hardship lies with the employer. *Nottelson v. Smith Steel Workers D.A.L.U. 19806,* 643 F.2d 445, 452 (7th Cir.), *cert. denied,* 454 U.S. 1046, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981); *Redmond,* 574 F.2d at 901; *see also EEOC v. Ithaca Indus., Inc.,* 849 F.2d 116, 118 (4th Cir.) (en banc), *cert. denied,* 488 U.S. 924, 109

S.Ct. 306, 102 L.Ed.2d 325 (1988); *Anderson v. General Dynamics Convair Aerospace Div.,* 589 F.2d 397, 401 (9th Cir.1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir.1987), *cert. denied,* 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). Once the employer has offered an alternative that reasonably accommodates the employee's religious needs, however, "the statutory inquiry is at an end;" the employer need not also show that other accommodations preferred by the employee would cause it undue hardship. *Philbrook,* 479 U.S. at 68, 107 S.Ct. at 371; *see also Wright,* 2 F.3d at 217.

The only attempt at accommodation made by Ilona here was to offer Tomilina and Glukhovsky a day off from work other than Yom Kippur. The offered accommodation cannot be considered reasonable, however, because it does not eliminate the conflict between the employment requirement and the religious practice. *See Wright,* 2 F.3d at 217; *see also Philbrook,* 479 U.S. at 70, 107 S.Ct. at 372. Aside from that, Ilona offered no other accommodation. It did not, for example, offer a partial day off to either employee, as it had to Tomilina the previous year, nor did it consider allowing the first employee making a request, but not the second or the third, to take the day off. Instead, the Meszaroses simply denied both requests when told that the requesting employees already had appointments scheduled. The district court correctly concluded, then, that Ilona made no attempt to reasonably accommodate its employees' religious practice. *See Redmond,* 574 F.2d at 903.

Absent a reasonable accommodation, Ilona was required to demonstrate that any accommodation would have caused it undue hardship. The district court found that Ilona failed to make that showing, and we treat its finding as one of fact, meaning that we will disturb it only upon concluding that the finding was clearly erroneous. *Nottelson,* 643 F.2d at 452; *Minkus v. Metropolitan Sanitary Dist.,* 600 F.2d 80, 81 (7th Cir.1979); *Redmond,* 574 F.2d at 903.

The Supreme Court has construed the term "undue hardship" in 42 U.S.C. § 2000e(j) to mean a cost to the employer that is anything more than de minimis. *Hardison*, 432 U.S. at 84, 97 S.Ct. at 2276; *see also Baz*, 782 F.2d at 706. The district court found in this case that Ilona would have suffered at most a de minimis cost had it accommodated the requests at the time they were made—that is, approximately ten days to two weeks in advance of the Yom Kippur holiday. The court reasoned that although Tomilina and Glukhovsky had been partially booked by that time, Ilona had ample time to reassign or to reschedule previously-booked appointments without incurring any financial hardship. By refusing to do so and by then scheduling additional appointments for the two employees, Ilona actually had enhanced the likelihood that it would lose revenues on September 29. But the court found that any loss actually incurred when Tomilina and Glukhovsky failed to appear for work on September 29 would not have been incurred had Ilona accommodated their requests when made.[7] The cost incurred in that circumstance, according to the court, would have been de minimis.

Ilona assaults that finding from a number of fronts. As we mentioned above, it argues that it denied the requests for legitimate business reasons—namely, that it expected to lose revenue if Tomilina and Glukhovsky were absent. The company emphasizes that Saturday is traditionally the salon's busiest day, that the Chicago salon was in the midst of an advertising campaign at the time, and that Tomilina and Glukhovsky were partially booked when their requests were made. Ilona argues, in other words, that it expected Saturday, September 29 to be an extremely busy day for the Chicago salon, and that it desired to have its full complement of service personnel available to service customers. Yet after reviewing Ilona's financial records, the Commission's expert believed, and Ilona's expert did not disagree, that there was not a statistically significant correlation between the number of estheticians or manicurists working in the Chicago salon on a given day and the salon's revenues for that day. That expert compared the revenues generated by the salon on a number of Saturdays in the late summer and fall of 1990, and concluded that the salon at times generated the same or greater revenues with a reduced staff than with its full complement of manicurists and estheticians. The district court found the expert's analysis persuasive and found corroboration for his opinion in two undisputed facts—that Ilona allowed employees to take Saturdays off for nonreligious reasons, and that it waited a full nine months before replacing Glukhovsky. *See Wisner v. Truck Central, A Subsidiary of Saunders Leasing Sys.*, 784 F.2d 1571, 1574 (11th Cir.1986) (failure to replace terminated employee is circumstantial evidence that the employer could have accommodated without undue hardship). After considering the evidence relating to September 29, moreover, the district court concluded that that was not an especially busy day for the Chicago salon, and that any inconvenience caused by the absences of Tomilina and Glukhovsky could have been avoided had Ilona rescheduled their appointments in advance. The district court's findings on these matters are supported by the evidence and are not clearly erroneous. Those findings support the district court's ultimate conclusion that Ilona would not have suffered undue hardship had it accommodated the religious requests.

■ Ilona responds, however, that the district court failed to also consider Ilona's precarious financial position at the time. It argues that the economic effect of accommodating the requests would have been magnified due to the company's poor financial health, and that as a result, it must be given added leeway in refusing any accommodation. Although we can agree that an employer's financial condition may at times be considered as part of the undue hardship

7. For this reason, the court discounted the testimony of Ilona's expert—its own accountant—that the Chicago salon lost $769.00 in revenue from the unexcused absences. Because this testimony was based on the assumption that both Tomilina and Glukhovsky were fully booked on September 29, it addressed the loss incurred by Ilona's *failure to accommodate,* and not the loss the company would have endured had it made an accommodation. *See* 885 F.Supp. at 1120.

equation,[8] we cannot agree that the district court committed clear error in failing to emphasize that fact here. The district court found that Ilona would not have incurred *any hardship* had it accommodated the requests. Thus, the court was never required to address whether a cost that may not have been particularly burdensome to a financially healthy employer should be considered an undue hardship to an employer in dire financial straits. What Ilona appears to be seeking is an exemption from the accommodation requirement altogether. Yet the fact that Ilona may have incurred losses in the three previous years does not remove the company from Title VII's reach. Absent a reasonable accommodation, Ilona was still required to establish undue hardship, and there was no clear error in the finding that it did not.

## III.

After finding that Ilona's decision to terminate the employment of Tomilina and Glukhovsky violated Title VII, the district court awarded back pay and prejudgment interest to Tomilina in the amount of $4,693.93, and to Glukhovsky in the amount of $62,355.32.[9] The court also ordered Ilona to reinstate Glukhovsky. The court then permanently enjoined Ilona from engaging in any practice that discriminates on the basis of religion and, to enable the Commission to monitor Ilona's compliance with that directive, required the company to provide periodic reports detailing employee requests for time off for religious reasons and its efforts to accommodate those requests. Ilona argues that Glukhovsky's back pay award is exces-

sive because she failed to mitigate her damages. It also contends that injunctive relief was not warranted where the Commission did not establish a pattern or practice of discrimination.[10] Judges Bauer and Kanne agree with Ilona and have therefore decided to reverse Glukhovsky's back pay award and to direct that the injunction be dissolved. They explain the reasons behind those decisions in the following section (Part III.A.). I respectfully disagree with their conclusions, however, and would affirm the district court's judgment in its entirety. I set out my reasons in Parts III.B. and III.C., which speak for me alone.

### A.[11]

The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole. *See Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444 (1976). Once the district court found unlawful discrimination in violation of Title VII, there was a strong presumption that Glukhovsky was entitled to a back pay award on the basis of what she would have earned absent the discrimination. *See EEOC v. O & G Spring and Wire Forms Specialty Co.*, 38 F.3d 872, 880 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). Here that amount is nothing, because the evidence uncontrovertibly shows that Glukhovsky planned to quit her job even before Ilona fired her. In fact, she had acquired a site and applied for a zoning permit for a Subway Sandwich Shop ("Sub-

---

8. *Cf. Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 543 (7th Cir.1995) (discussing relevancy of the financial health of the employer under the distinct "undue hardship" provision of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*); *see also Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir.) (reasonable accommodation and undue hardship determinations depend upon the facts and circumstances of each case, and ultimately boil down to whether the employer acted reasonably), *cert. denied,* —— U.S. ——, 115 S.Ct. 2600, 132 L.Ed.2d 846 (1995); *General Dynamics*, 589 F.2d at 400 (same).

9. Tomilina's award was significantly less because she was able to secure comparable employment shortly after her termination.

10. Preliminarily, Ilona also argues that neither back pay award should stand because the trial evidence established that Tomilina and Glukhovsky would both have been terminated for misdeeds apart from their failure to appear for work on September 29, 1990. The district court concluded that this evidence was not credible and that Ilona's proffered alternative explanations for the discharges were pretextual. That finding is supported by the evidence and is not clearly erroneous.

11. This section was drafted by and speaks only for Judges Bauer and Kanne.

way") franchise in Evanston over a month before her termination. Glukhovsky planned to "be [her] own boss" and run the store herself. And the district court found as a matter of fact that:

114. When seeking her zoning permit, Glukhovsky testified to the Evanston Zoning Board, "I am the one who is going to run the shop."

115. Glukhovsky's testimony minimizing the amount of time spent at the Subway so as to suggest that she could have maintained her full time work at Ilona of Hungary while also starting a new business is not credible. Although she may well not have quit her job in order to operate the franchise, the weight of the evidence is that once she was fired, and after a brief period of looking for work, she devoted her work life to running the business and attending to her child.

116. The evidence that Glukhovsky continued diligently to seek other work in 1991 continuing to the present is not credible.

Despite the court's doubts about Glukhovsky's credibility, it nevertheless concluded as a matter of fact that Glukhovsky would have continued to work at Ilona had she not been fired. But this finding ignores the testimony of several of Glukhovsky's coworkers that Glukhovsky had no intention of continuing to work at the salon. Shala Murphy, who commuted to work with Glukhovsky, testified that Glukhovsky wished to be fired so that she could focus on setting up the Subway franchise. Another coworker, Ruth Mayer, testified that Glukhovsky hoped Ilona would fire her so that she could collect unemployment compensation while she opened her business. Erika Aranyos corroborated this testimony. In light of the evidence presented, we conclude that the district court clearly erred in finding as a matter of fact that Glukhovsky would have continued to work at the salon had she not been terminated.

■ Although we agree that the district court has broad discretion to fashion a remedy for unlawful discrimination, that discretion is to locate "a just result" in light of the circumstances of the particular case. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405,

424, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280 (1975). The court must "do its best to recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred." *United States v. City of Chicago*, 853 F.2d 572, 575 (7th Cir. 1988). Here, the award of back pay to Glukhovsky places her in a better position than she would have occupied had the discrimination not occurred, because she would have quit anyway. We cannot sanction such a result, and therefore reverse the award of back pay to Glukhovsky.

■ We also conclude that the injunction should not lie because there was no showing that Ilona engaged in a pattern or practice of similar discrimination. Although the district court found "no evidence of prior incidents such as these," it nevertheless granted injunctive relief because it "remained concerned with the possibility of future discrimination." The court's concern derived from Ilona's request that Chicago employees return their employment manuals. But that action does not necessarily indicate discrimination. Perhaps the court was "concerned," but not on this record. We have not before approved an injunction based on nothing more than some ephemeral "concern" about future discrimination. For example, in *EEOC v. Gurnee Inn*, 914 F.2d 815, 817 (7th Cir.1990), we upheld an injunction where the discrimination resulted from *"Gurnee Inn's continued toleration of that behavior."* (emphasis in original). Similarly, in *Dombeck v. Milwaukee Valve Co.*, 40 F.3d 230, 238 (7th Cir.1994), we noted that "[i]f the district court finds that MVC subjected Dombeck to a hostile work environment in violation of Title VII, the court certainly would not abuse its discretion in issuing a similar injunction." A hostile work environment, by definition, requires discrimination that is pervasive. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). And although in *EEOC v. Harris Chernin, Inc.*, 10 F.3d 1286, 1292 (7th Cir.1993), we noted in passing that "[t]o make a case for injunctive relief, the EEOC may not need to produce evidence of

discrimination beyond [the employee's] case," there the EEOC had alleged that Chernin "has engaged in and is continuing to engage in unlawful employment practices," 10 F.3d at 1291, and a pattern of discrimination may relate to only one employee.

Because the record does not show that Ilona engaged in a pattern of discrimination that would warrant injunctive relief, we remand to the district court with instructions to dissolve the injunction.

### B.[12]

I would affirm Glukhovsky's back pay award because I cannot agree with my colleagues that "the evidence uncontrovertibly shows that Glukhovsky planned to quit her job even before Ilona fired her." (*Supra* at 213.) Glukhovsky denied that she intended to quit and testified that she planned to work at Ilona until the income she and her husband derived from the Subway franchise was sufficient to replace what they both earned from their existing employment. The district court credited Glukhovsky's testimony on this point, finding that she would have continued to work for Ilona indefinitely had she not been fired on October 6. (R. 114 at 27.) Plainly, then, the evidence on this point is not uncontroverted, as my colleagues blithely suggest. Moreover, the findings relied on by the majority to support its conclusion actually are addressed to a separate question—whether or not Glukhovsky's Subway earnings should be subtracted from the back pay due to her. As I will demonstrate below, those findings are not inconsistent with the district court's conclusion that Glukhovsky would have continued to work for Ilona indefinitely had she not been fired. In short, then, the majority is substituting its own judgment for that of the district court, although it neither heard the disputed testimony nor viewed the demeanor of the relevant witnesses. My colleagues essentially are finding from a cold record that a central portion of Glukhovsky's testimony was not credible, although the district court, not similarly restricted only to reading words from a page, decided to credit that testimony. Because I believe that the majority has over-

stepped the bounds of its reviewing authority in taking that step, I respectfully dissent from its decision to take away Glukhovsky's back pay award.

Initially, it is important to emphasize that a district court is vested with broad discretion to fashion a complete remedy once it finds that a defendant has engaged in a practice prohibited by Title VII. *See* 42 U.S.C. § 2000e–5(g)(1); *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir.1990). The statute aims "to make the victims of unlawful discrimination whole by restoring them, so far as possible … to a position where they would have been were it not for the unlawful discrimination." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982) (internal quotations omitted); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). Complete relief for a victim of discrimination generally will include an award of back pay; indeed, such an award is presumptively proper once a violation has been shown. *EEOC v. O & G Spring and Wire Forms Specialty Co.*, 38 F.3d 872, 880 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995); *United States v. City of Chicago*, 853 F.2d 572, 575 (7th Cir.1988). If the victim of discrimination comes forward with evidence of the monetary harm that flowed from the employer's unlawful conduct, it is the employer's burden to prove that the victim failed to mitigate her damages or that the requested damages are otherwise excessive. *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir.1994); *Gurnee Inn*, 914 F.2d at 818; *Sprogis v. United Air Lines, Inc.*, 517 F.2d 387, 392 (7th Cir.1975). Lack of mitigation, then, is an affirmative defense that the employer bears the burden of proving. *Gurnee Inn*, 914 F.2d at 818; *Gaddy v. Abex Corp.*, 884 F.2d 312, 318 (7th Cir.1989). To do so, "the employer must prove 'both that the [claimants were] not reasonably diligent in seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance that the [claimants] might have found comparable employment.'" *Gurnee Inn*, 914 F.2d

---

**12.** Parts III.B. and III.C. of this opinion speak for Judge Rovner alone.

at 818 (quoting *City of Chicago,* 853 F.2d at 578) (emphasis omitted).

The district court found that Ilona had not met its burden of proving a failure by Glukhovsky to mitigate her damages. From the evidence at trial, the court discerned that Glukhovsky had made reasonably diligent efforts to find comparable employment, as she had applied for esthetician positions with other downtown Chicago salons and with salons in north suburban locations. Although Glukhovsky discontinued an aggressive job search less than six months after her termination because she believed at that point that her application had been filed with most potential employers, she then mitigated damages by commencing to operate a Subway franchise. The district court found that if Ilona had not terminated her employment on October 6, 1990, Glukhovsky would have continued to work indefinitely at Ilona's Chicago salon. The court therefore found that Glukhovsky was entitled to an award of back pay from the time of her termination to the time of judgment. The court, however, subtracted from that award Glukhovsky's interim earnings from the Subway franchise. *See* 42 U.S.C. § 2000e–5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.") The district court's mitigation finding is reviewed only for clear error. *Gurnee Inn,* 914 F.2d at 818; *City of Chicago,* 853 F.2d at 578. An appellate court may reverse that finding only if it "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Both the Supreme Court and this court have said on many occasions, moreover, that where there are two permissible views of the evidence, the district court's choice between them cannot be considered clearly erroneous. *See, e.g., Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991); *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *United States v. Navar-*

*ro,* 90 F.3d 1245, 1252 (7th Cir.1996); *Eyler v. Comm'r of Internal Revenue,* 88 F.3d 445, 448 (7th Cir.1996); *Thornton v. Brown,* 47 F.3d 194, 197 (7th Cir.1995). That rule applies even where the appellate court may think the district court's choice a dubious one. *United States v. Canoy,* 38 F.3d 893, 899 (7th Cir.1994).

Ilona addresses two arguments to the mitigation finding, neither of which persuades me that the lower court clearly erred. First, Ilona asserts that the district court ignored its own finding that Glukhovsky had abandoned her job search less than six months after her termination.[13] It argues that based on that finding, Glukhovsky should have recovered back pay only for the period during which she actually was looking for alternate employment. Yet Ilona failed to rebut Glukhovsky's testimony that she effectively ended her job search only after exhausting the available esthetician opportunities. Ilona has pointed to no steps that Glukhovsky should have taken in order to find comparable employment that she did not, nor has it shown that comparable jobs were available for which Glukhovsky failed to apply. It is possible for a discharged employee to satisfy her obligation to mitigate damages even if her job search did not ultimately succeed, so long as she demonstrates an honest, good faith effort to locate comparable employment. *See Smith v. Great American Restaurants, Inc.,* 969 F.2d 430, 438 (7th Cir.1992).

There is, however, an even more fundamental difficulty with Ilona's argument—it ignores the fact that after January 1991, Glukhovsky effectively mitigated her damages by operating the Subway franchise. We held in *Smith* that "[s]elf-employment can constitute employment for purposes of mitigating damages, as long as the self-employment was a reasonable alternative to finding other comparable employment." *Id.; see also Carden v. Westinghouse Elec. Corp.,* 850 F.2d 996, 1005 (3d Cir.1988). Ilona failed to show that the Subway franchise was not a reasonable means for Glukhovsky to mitigate

---

**13.** The majority also emphasizes that finding in concluding from a cold record that Glukhovsky was not a credible witness. (*See supra* at 214.)

her damages once she was unable to secure a comparable position as an esthetician.

Ilona responds, however, and the majority agrees, that Glukhovsky did not turn to the Subway franchise as a means of mitigating damages because she had begun planning that endeavor while she was still working for Ilona. The company argues, then, that Glukhovsky should not recover back pay at all because she was planning all along to quit her job with Ilona to operate the Subway franchise. To support that argument, Ilona points to the testimony of other employees of its Chicago salon to the effect that Glukhovsky wanted to be fired so that she could collect unemployment while initiating her Subway operation. The majority has similarly emphasized that evidence and apparently has decided, based upon the appellate transcript, that the evidence was worthy of credence. (*See supra* at 214.) After hearing the evidence, however, the district court rejected it [14] and instead credited Glukhovsky's assertions that she would not have quit had she not been fired. The district court also believed Glukhovsky's assertion that she had intended to continue working at Ilona until the income she derived from the Subway franchise was sufficient to replace her own salary and the salary earned by her husband as a taxi driver. The court therefore found that if Ilona had not terminated her employment on October 6, 1990, Glukhovsky would have continued to work there indefinitely.[15] I do not believe Ilona has shown any of these central findings to be clearly erroneous, nor has it provided me with any persuasive reason for doubting the district court's credibility assessments. I must therefore conclude that the district court did not clearly err in its mitigation finding and did not abuse its discretion in awarding back pay to Glukhovsky.

In choosing to second-guess the district court's credibility determinations, however, the majority points to two aspects of Glukhovsky's testimony that the district court refused to credit. My colleagues apparently conclude from those instances that Glukhovsky could not have testified credibly in stating that she would not have quit had she not been fired. The majority's reasoning is thus akin to holding that Glukhovsky's testimony must be rejected in its entirety because two statements were found lacking in credibility. But that is simply not the law, for it is clear that a finder of fact may accept certain aspects of a witness' testimony and reject others. *E.g., Bergmann v. McCaughtry,* 65 F.3d 1372, 1378 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1552, 134 L.Ed.2d 654 (1996); *Kraushaar v. Flanigan,* 45 F.3d 1040, 1054 (7th Cir.1995); *United States v. Colston,* 936 F.2d 312, 315 (7th Cir.), *cert. denied,* 502 U.S. 951, 112 S.Ct. 403, 116 L.Ed.2d 352 (1991). Indeed, my colleagues apparently would concede that point because they have not quarreled with the district court's decision to credit other aspects of Glukhovsky's testimony—e.g., that she had a sincerely-held religious belief that she should refrain from working on Yom Kippur. (*See supra* at 210–11.) My colleagues must be saying, then, that the finding I find most central—that Glukhovsky would have continued to work at Ilona indefinitely had she not been fired—cannot live in harmony with the district court's decision to reject two other aspects of her testimony—that she spent so little time at the Subway franchise during its first eight months that she could have continued to work full-time at Ilona, and that she diligently sought comparable work as an esthetician from 1991 to the present. *See Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512 (where the finding of a trial judge is based on

---

**14.** It was not unusual for the district court to reject evidence offered by Ilona through its employees on the ground that the evidence was not credible. The court in fact frequently declined to credit the factual assertions of present or former Ilona employees on the ground that their testimony was biased in favor of the employer. (*See, e.g.,* R. 114 at 8 n. 6, 10–11, 14, 15 & n. 12, 16, & 22–23 n. 14.)

**15.** That finding is supported by the fact that Glukhovsky sought and obtained reinstatement to her position with Ilona even while operating the Subway franchise. It also is supported by the fact that Glukhovsky sought a comparable esthetician position for approximately six months after Ilona fired her. If, as the majority believes, Glukhovsky planned to quit even before she was fired, it is difficult to understand why she would look for another position as an esthetician. Yet even Ilona does not dispute that she did.

a credibility determination, that finding may not be disturbed unless the testimony on which it is based was facially implausible, internally inconsistent, or contradicted by extrinsic evidence).

Yet a careful reading of the record reveals that neither Finding 115 nor Finding 116 (see supra at 214) undercuts the more central finding that my colleagues have determined to reject. Each of those findings is addressed not to whether Glukhovsky planned to quit her job at Ilona, but to the contention of the EEOC below that Glukhovsky's back pay award should not be reduced by her interim Subway earnings because she would have performed both jobs had she not been fired. (See EEOC's Post–Trial Proposed Findings of Fact (R. 101) at ¶ 196 ("Any income Glukhovsky received as the result of her ownership of the Subway franchise would have been earned by Glukhovsky even if she had never been fired by Defendant."); see also id. at ¶¶ 197–98.) The Commission advanced that theory in requesting a back pay award of $100,504.00. (See id. at ¶¶ 202–06.) Before Glukhovsky would be entitled to an award of that magnitude, however, the Commission would have to show two things: (1) that Glukhovsky could physically have performed both jobs, and (2) that she continued to look for comparable work as an esthetician during the entire back pay period. In Findings 115 and 116, the district court found the EEOC's proof on those points lacking. The court thought it unlikely that Glukhovsky could have devoted the same amount of time to the Subway franchise had she been working at Ilona, and that she had ended her search for comparable employment as an esthetician after approximately six months. The court therefore subtracted Glukhovsky's Subway earnings from the back pay requested by the Commission and awarded back pay of $62,355.32. (See R. 112, App. A (detailing calculation of Glukhovsky's back pay).) In light of that history, Findings 115 and 116 cannot be viewed as inconsistent with the finding that Glukhovsky would not have quit had she not been fired. Those findings indicate only that Glukhovsky devoted more time to the Subway franchise than she otherwise

would had she continued to work at Ilona, and that absent her termination, she would have paid an onsite manager to perform the tasks she ultimately performed for the franchise.[16] Those findings, in short, do not compel the conclusion my colleagues extract from them—that Glukhovsky planned to quit had she not been fired.

I therefore believe that the majority has no legitimate basis for disregarding the district court's credibility determinations and for finding from a cold record that Glukhovsky planned to quit her job all along. I would affirm Glukhovsky's back pay award.

C.

Ilona finally argues, and the majority also agrees, that permanent injunctive relief is inappropriate because there has been no showing that the company engaged in a pattern or practice of similar discrimination. Once employment discrimination has been shown, however, district judges have broad discretion to issue injunctions addressed to the proven conduct. See Dombeck v. Milwaukee Valve Co., 40 F.3d 230, 238 (7th Cir.1994); Gurnee Inn, 914 F.2d at 817; Gaddy, 884 F.2d at 318; see also Briscoe v. Fred's Dollar Store, Inc., 24 F.3d 1026, 1028 (8th Cir.1994). The section of Title VII authorizing injunctive relief does not itself require that a pattern or practice of unlawful conduct be shown; instead, injunctive relief is authorized once the court has found that the defendant intentionally engaged in an unlawful employment practice. 42 U.S.C. § 2000e(g)(1); see also B.L. Schlei & P. Grossman, Employment Discrimination Law 1415 (1983).

This court has intimated in response to a similar argument, moreover, that injunctive relief is appropriate even where the Commission has produced no evidence of discrimination going beyond the particular claimant's case. EEOC v. Harris Chernin, Inc., 10 F.3d 1286, 1292 (7th Cir.1993) (citing EEOC v. Goodyear Aerospace Corp., 813 F.2d 1539, 1544 (9th Cir.1987) ("Generally, a person subjected to employment discrimination is entitled to an injunction against future dis-

---

16. Indeed, now that Glukhovsky has returned to work at Ilona pursuant to the reinstatement or-

der, she pays someone else to manage the day-to-day operations of the Subway.

crimination unless the employer proves it is unlikely to repeat the practice." (citations omitted))); *see also EEOC v. United Parcel Serv.*, 94 F.3d 314, 318 (7th Cir.1996). In a series of cases, in fact, we have approved permanent injunctions addressed to the type of discrimination proven by a particular plaintiff without searching the record for evidence of a pattern or practice of similar conduct. *See Knox v. State of Indiana*, 93 F.3d 1327, 1331, 1337 (7th Cir.1996) (affirming injunction barring retaliation against a single plaintiff after upholding jury verdict finding past retaliation); *Dombeck*, 40 F.3d at 238 (approving injunction where harasser and his victim had already been assigned to different work areas and there was no evidence of additional harassment); *Gurnee Inn*, 914 F.2d at 817 (no abuse of discretion in enjoining future harassment although employer had terminated employment of primary harasser); *Gaddy*, 884 F.2d at 318 (injunction against proven discriminatory conduct appropriate where the plaintiff had been reinstated); *Sprogis v. United Air Lines*, 444 F.2d 1194, 1202 (7th Cir.) (injunction not an abuse of discretion where discriminatory policy had been revoked but the plaintiff had been reinstated), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971). We have looked instead to whether the discriminatory conduct could possibly persist in the future. *See Gurnee Inn*, 914 F.2d at 817; *see also Dombeck*, 40 F.3d at 238.

The district court noted in this case that the Commission had produced no evidence of past discrimination, but the court remained concerned with the possibility of future discrimination. That concern was prompted in part by the discriminatory conduct proven by the EEOC in this case, and in part by the fact that Ilona effectively withdrew its stated policy of accommodating timely religious requests when it ordered Chicago employees to return their employment manuals on the day before the terminations in question. Ilona has yet to offer an adequate explanation for the confiscation of the employment manuals, and I agree with the district court that the timing of that event does not reflect well on Ilona's sensitivity to its obligations under Title VII.[17] I further believe that injunctive relief is justified where, as here, the individuals who were found to have discriminated remain the defendant's primary decisionmakers. *See Gurnee Inn*, 914 F.2d at 817 (finding possibility that discrimination could persist where manager who had been aware of discriminatory conduct was still employed by the defendant). The Meszaroses offered no evidence to suggest that they no longer will discriminate on account of an employee's religious beliefs; they have instead revoked the company's longstanding accommodation policy and have insisted throughout this litigation that they in fact never discriminated. In these circumstances, then, there necessarily is a possibility that the discriminatory conduct could persist. Having heard the Meszaroses' testimony, moreover, the district court is far better suited than this court to make that determination. For these reasons, I would find that the district court acted well within its considerable discretion by granting injunctive relief narrowly tailored to the discrimination proven in this case.

## IV.

We affirm the judgment below insofar as it finds that Ilona of Hungary, Inc. engaged in religious discrimination in violation of Title VII. We also affirm the $4,693.93 in back pay awarded to Tomilina. Yet the majority of this panel hereby reverses the $62,355.32 back pay award to Glukhovsky, and remands to the district court with instructions to dissolve the injunctive relief entered below. I respectfully dissent from the latter holdings and would affirm the district court's judgment in its entirety. The parties are to bear their own costs on this appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

17. The majority insists, however, that Ilona's confiscation of the employment manuals on the day of the terminations "does not *necessarily* indicate discrimination." (*Supra* at 214 (emphasis added).) True enough. With respect, however, I would submit that whether it did or did not was a judgment for the district court to make.